**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL BOYLE, individually and as Independent Executor of the Estate of MARY MICHELLE BOYLE, as Personal Representative of the Estate of KATIE BOYLE, Deceased, and as Father and Next Friend of SHANNON BOYLE, a minor,** ) ) ) ) ) ) ) | |
| **Plaintiffs,** ) ) | **Case No. 05 C 1082** |
| **vs.** ) ) | |
| **RJW TRANSPORT, INC., SKF USA, INC., and LESLIE D. BROCKETT,** ) ) ) | |
| **Defendants.** ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Defendant SKF USA, Inc., whose shipment defendant Leslie Brockett was

hauling when his tractor-trailer struck plaintiffs' vehicle in a 2004 freeway accident, has

moved for summary judgment on plaintiffs' claims of vicarious liability and to strike the

proffered report of plaintiff's expert.  Plaintiffs argue that SKF's business arrangement

with RJW Transport, Inc., the trucking firm for which Brockett was an authorized driver,

was such that RJW and Brockett were agents for whose torts SKF may be held liable.

For the reasons set forth below, the Court grants SKF's motions.

## Background

This case stems from a vehicle collision that occurred on Interstate 70 in Effingham County, Illinois on July 2, 2004. A tractor-trailer driver by defendant Leslie Brockett, an authorized driver for defendant RJW Transport, struck the rear of a minivan driven by plaintiff Michael Boyle in which his wife and two daughters were passengers. Boyle and his daughter Shannon were injured but survived the accident. Boyle's wife and their daughter Katie did not. Boyle, both individually and on behalf of his late wife and daughter and surviving daughter, has asserted a variety of tort claims against Brockett, RJW, and SKF USA, Inc., whose shipment of rubber seals was part of the load Brockett was carrying when he struck the Boyle family vehicle. The Court has jurisdiction over this suit under 28 U.S.C. § 1332.

RJW admitted early in this litigation that Brockett was its agent. In February of this year, after the close of fact discovery, Brockett and RJW filed an amended answer in which they admit that Brockett's negligence caused the accident.

By contrast, SKF has resisted Boyle's characterization of its relationship with RJW (and thus with Brockett) as that of a principal and an agent such that SKF is vicariously liable for the conduct of RJW and Brockett. SKF has now moved for summary judgment on the ground that no principal-agent relationship existed between it and RJW.

Because the contours of SKF's business relationship with RJW bear directly on the issue raised by this motion for summary judgment, the Court begins by sketching certain salient details of that relationship.

At the time of the accident, SKF and RJW's dealings were governed by a contract titled "Transportation Agreement." Def. Statement of Facts, Ex. H. The agreement required RJW to "dedicate equipment, [an] on-site manager and drivers" specifically to SKF, *id.* ¶ 6.1.2, which made the agreement what is known in the trucking industry as a dedicated carriage contract. Under the agreement, RJW "acknowledge[d] that [SKF's] strategic goal is [RJW] provides 100 percent on-time service." *Id.* ¶ 6. The agreement required RJW to submit to SKF monthly reports on the transit time of shipments it handled for SKF and on any late shipments; in relation to the latter, RJW agreed to "take corrective action as needed to assure adequate performance." *Id.* ¶ 6.1.1. Another provision called for quarterly assessments that covered, among other things, RJW's "profitability for transporting [SKF's] products," ways RJW might cut costs (notably fuel costs), and ways SKF and RJW could communicate better. *Id.* ¶ 6.1.3.

The agreement also stated that RJW's status was that of an independent contractor, saying this status "shall govern the relationships between the parties hereto [i.e., SKF and RJW] and third parties." *Id.* ¶ 12.1. It further provided that RJW "shall have exclusive control and direction of any person operating the tractors or otherwise engaged in providing transaction or logistics services" to SKF. *Id.* ¶ 12.2.

An appendix to the agreement contains lists of "metrics"—which appear to the Court to be somewhat detailed conditions—the parties agreed would be met at the start of the contract period and continuously thereafter. These "metrics" include the following items: "All personnel, (local and road drivers and on site project manager), hired, trained and processed through the [SKF] orientation program prior to" the start date of

3

contract period; "All PC Hardware, Networking and Telecommunications equipment needs . . . are to be secured and operational prior to the start-up date"; "Operational plans to be 100% on time without delay"; "Establish monthly 'Steering Committee Meetings.'" *Id.*, Appx. C.

A separate appendix to the agreement set out a series of "assumptions" underlying the precise shipping charges contemplated by the agreement. One of these "assumptions" concerns the RJW manager who was required to work from SKF's Elgin, Illinois facility—a job filled by Richard Jarvis. The text reads in relevant part as follows:

> The Project manager is to report to [an SKF-]provided office by 7:30 AM central time. The individual will be responsible for but not limited too, [sic] the daily fleet operation and related activities. . . . Supervisor will interact between suppliers and customers making appointment pick-ups and deliveries as required, communicate between outside suppliers . . . directing those suppliers to provide services as required and act in a transportation supervisory capacity reporting to [RJW] as well as [SKF] management.

*Id.*, Appx. D.

As noted, the thrust of Boyle's claim against SKF is that the Transportation Agreement made RJW SKF's agent, which in turn would justify the imposition of vicarious liability for Brockett's admittedly negligent conduct.

## Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For purposes of the motion, the

Court reads the evidentiary record in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

## I. Admissibility of Plaintiffs' Expert Williams's Report

The Court will address first SKF's challenge, under Federal Rule of Evidence 702, to the admissibility of a report written by plaintiffs' expert, Michael J. Williams. Williams's proffered report is part of the materials on which plaintiffs rely in their opposition to summary judgment. Although Williams likely would also give live testimony at trial were this case to reach that stage, the immediate aim of SKF's motion is to keep his report out of the record on summary judgment on the ground that is inadmissible. *See* Fed. R. Civ. P. 56(e)(1) ("[a] supporting or opposing affidavit must . . . set out facts that would be admissible in evidence").

Williams, who works as a truck driver and a litigation expert in trucking-safety cases, opines in his proffered report that the SKF-RJW agreement "made them equal partners in the operation of a dedicated fleet . . . and made the carrier a direct agent of the shipper through specific tasks not normally required of a dedicated motor carrier." Def. Mot. to Exclude, Ex. A at 4. He further opines that the same agreement made Brockett SKF's agent.

The primary—and dispositive—problem with Williams's proffered report is that it offers a legal conclusion that would determine the outcome of the case with regard to SKF, something expert testimony may not do. *See Good Shepherd Manor Found. v.*

*City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)); *RJCLS Enters., Inc. v. Prof'l Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) (citing *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994)) ("expert" opinion that offers legal conclusions that belong in a legal brief is subject to exclusion). Williams's conclusion that RJW was SKF's "direct agent" and that Brockett, whom the Federal Motor Carrier Safety Regulations made RJW's employee, was thus also SKF's agent, is precisely the legal theory on which Boyle's claim against SKF hinges.  Its admission as expert testimony would contravene Rule 702.  *See Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, No. 04-C-1587, 2007 WL 831613, at *3 (S.D. Ind. Mar. 5, 2007) (excluding proffered report in which defense expert opined that parties' relationship "was strictly that of an independent contractor" because this opinion "[went] to the heart of Plaintiffs' breach of fiduciary duty and constructive fraud claims" in violation of Rule 702).

    In response to SKF's motion to exclude Williams's proffered report, Boyle argues that Williams's use of the legal terms "agent" and "partnership" (an arrangement that also implicates agency principles, *see Gilpin v. Lev*, 70 Ill. App. 2d 66, 75, 217 N.E.2d 477, 481 (1966)) was "merely coincidental" and that Williams did not understand the legal import of these terms in relation to vicarious liability, a concept Williams also purportedly does not understand.  Pl. Resp. to Mot. to Exclude at 7.  Boyle also contends that, in any event, Williams did not intend to opine about SKF's liability.

    The record shows otherwise.  Williams initially testified in his deposition that he

did not understand the term "vicarious liability," but then immediately indicated he did

when SKF's counsel related this concept to Williams's opinion that RJW was SKF's

agent:

> Q.  You indicate here your opinion that RJW is an agent of SKF.  Is that your opinion, sir?
> A.  Yes.
> Q.  Is it your opinion therefore SKF is vicariously liable for the actions of RJW?
> A.  Now I understand your meaning, yes.
> . . .
> Q.  Okay.  But you're rendering an opinion that there is vicarious liability based on an agency relationship?
> A.   There would be, as I'm understanding vicarious liability, is that they have, I guess, an attached liability—I guess that's the way I would describe it from what I'm understanding from you—that being part of this relationship, this partnership with RJW Transportation, that they have a responsibility, definitely have a responsibility, that they could be held into a liability.

Def. Mot. to Exclude, Ex. B at 33-35.  This exchange shows that Williams understood

perfectly well that his opinion that the SKF-RJW agreement created an agency

relationship meant that SKF would "have . . . an attached liability."  This legal

conclusion is the central thrust of Williams's proffered report.  The report is inadmissible

for this reason and will not play any role in the Court's analysis of SKF's motion for

summary judgment.

Williams's report suffers from other problems that would independently render it

inadmissible under Rule 702.  The Court's role in relation to proffered expert testimony

is routinely described as that of a gatekeeper:  expert testimony is admitted only upon a

satisfactory showing of its reliability and helpfulness to the trier of fact in deciding a

disputed issue.  *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001)

(citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 573, 589 (1993)); *Smith v. Ford Motor*

*Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("[t]he trial court is limited to determining whether

expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.").  With regard to a proffered expert's methods, the Court as gatekeeper must identify the reasoning articulated for the expert's conclusions and assess it against the reliability criteria articulated by Rule 702 and the Supreme Court's *Daubert* decision.  *See Fuesting v. Zimmer*, 421 F.3d 528, 535-36 (7th Cir. 2005), *vacated on other grounds on reh'g*, 448 F.3d 936 (7th Cir. 2006); *Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-20 (7th Cir. 2005) (testimony of expert who cited only his "expertise" as basis for damages estimate, and who rejected use of data from other geographical markets to inform estimate, was properly excluded under Rule 702).

The method used by Williams to form his conclusion does not satisfy Rule 702's reliability criteria.  Williams's method—such as it is—is ostensibly a comparative one: he opines that RJW was SKF's agent because their agreement dictated "specific tasks not normally required of a dedicated motor carrier."  Def. Mot. to Exclude, Ex. A at 4. His focus is entirely on the RJW-SKF agreement's deviation from this asserted baseline.  Yet Williams does not offer any explanation of what is "normally required." Williams says that he knows what the claimed baseline is from his experience negotiating a handful of dedicated-carriage contracts and working under one in his current job.  But his report shares none of that insight.  We have only Williams's assertion that the SKF-RJW agreement is abnormal because the half-dozen provisions Williams singles out make it so.  This is the unhelpful "*ipse dixit* of the expert."  *Gen. Elec. Corp. v. Joiner*, 522 U.S. 136, 146 (1997).

Further, Williams admitted in his deposition that he did not put the SKF-RJW agreement side by side with any other dedicated-carriage contracts to assess exactly how and where that agreement departed from the norm. He used only the contract itself, deposition transcripts in this litigation, and "[his] experience within the industry" to form the opinion. Def. Mot. to Exclude, Ex. B at 20-22. Thus, because there is no indication that any comparator beyond Williams's intuition was used, *see Zenith Elecs.*, 395 F.3d at 418-20, and because no comparative reasoning is spelled out in Williams's opinion, his proffered report does not pass muster under Rule 702's reliability requirements.

Nor is it clear that any such comparative analysis would be helpful to the trier of fact, as required by Rule 702. As SKF argues, this case hinges on the SKF-RJW agreement, not in relation to the typical content of dedicated-carriage contracts or other industry practices, but in its own right. The question is whether, under Illinois law, this agreement creates a principal-agent relationship or an independent contractor relationship—not whether it let SKF play a more direct role in RJW's performance than other contracts might have done. *See Caballero v. Archer*, No. 04-C-561, 2007 WL 628755, *4 (W.D. Tex. Feb. 1, 2007) (rejecting plaintiff's proffered expert report because its conclusions were "based on [the expert's] interpretation of industry standards or trucking practices, rather than the common law factors established by Texas courts" for determining the existence of an agency relationship).

Nor is there any asserted ambiguity about contract terms that would justify expert testimony about standard industry practices. *Cf. WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir.1994) (citing *In re Pearson Bros. Co.*, 787

F.2d 1157, 1161 (7th Cir. 1986)) (admission of expert testimony about real-estate industry custom and usage to address ambiguous contract provision was proper). On the contrary, the contract is comprehensible to a layman on its own.

For these reasons, the Court grants SKF's motion to exclude Williams's proffered opinions regarding the agency issue from its consideration of SKF's summary judgment motion.

## II.     SKF and RJW's business relationship

Was RJW merely an independent contractor or was it SKF's agent? This question is of central importance because Boyle seeks to hold SKF vicariously liable for the admitted negligence of Brockett and RJW. *See* Restatement (Third) of Agency §§ 7.03 & 7.07. Boyle cannot do this if RJW was an independent contractor and not an agent. *Hale v. Johnson*, 80 Ill. 185 (1875); *Adamses v. Sheahan*, 378 Ill. App. 3d 502, 515, 880 N.E.2d 559, 572 (2007) (*citing Darner v. Colby*, 375 Ill. 558, 560, 31 N.E.2d 950, 951 (1941)).

Under Illinois law, which governs this facet of the case, *see* Def. Statement of Facts, Ex. H at ¶ 17, there is no fixed rule for distinguishing independent contractors from agents. Rather, the analysis takes in several factors, including whether the person or entity for whom the work is done can fire the person or entity that performs the work, which party provides the equipment and materials needed for the job, the degree of skill the job demands, and how the one who performs the work is paid. *See Wilson-McCray v. Stokes*, Nos. 01-C-1929 & 01-C-5808, 2003 WL 22901569, at *2 (N.D. Ill. Dec. 9, 2003) (citing *Shoemaker v. Elmhurst-Chi. Stone Co.*, 273 Ill. App. 3d 916, 652 N.E.2d

10

1037, (1994)); *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d 775, 783, 641 N.E.2d 845, 851 (1994).

One factor in particular, however, is primary and often dispositive: the right to control the manner in which the work in question is done, "as opposed to the mere result." *Perkinson v. Manion*, 163 Ill. App. 3d 262, 268, 516 N.E.2d 977, 981 (1987). Critically, courts in cases that resemble this one have found no agency relationship to exist even when the shipper has controlled or dictated carrier activities ancillary to, but not part of, the work itself. *See Shoemaker*, 273 Ill. App. 3d at 921, 652 N.E.2d at 1041 (shipper's help loading truck was "preliminary task[] necessary before the driver could begin to perform" and shipper's instruction as to where to deliver load "did not control the manner in which the job was done but rather specified the particular hauling task"); *Petersen*, 267 Ill. App. 3d at 783-84, 641 N.E.2d at 851 (shipper set driver's schedule and provided special vats for hauling molten aluminum, but this "insignificant retention of control" did not make driver more than an independent contractor of shipper); *Cable v. Perkins*, 121 Ill. App. 3d 127, 459 N.E.2d 275 (shipper handled customer complaints against independent contractor driver); *Trzaska v. Bigane*, 325 Ill. App. 528, 535, 60 N.E.2d 264, 267 (1945) (driver's collection of money for deliveries he made for shipper and display of shipper's name on a plate on driver's truck did not outweigh other facts that established, as a matter of law, that driver was independent contractor); *see also Wilson-McCray*, 2003 WL 22901569, at *6 (requirements that certain shipments be completed within 24 hours and that drivers report accidents to shipper meant only that shipper "had an interest in making sure that its customers received their goods in a

timely manner; and the fact that it monitored this process . . . no more creates any agency relationship than does the designation of overnight delivery on a Federal Express package"). In sum, the person for whom the work is done may dictate both the result and certain matters ancillary to the work, though not the manner in which the work itself is to be done, and maintain an independent-contractor relationship with the worker.

Both sides, but especially Boyle, focus their arguments on contract provisions. The actual conduct of the parties, and not the language of any agreement between them, typically controls in the analysis of whether a principal-agent relationship exists. *Nanahan v. Daily News-Tribune*, 50 Ill. App. 3d 9, 14, 365 N.E.2d 1045, 1049 (1977). "Such contract between the parties need not necessarily be conclusive although it may be, if the parties to the contract abide by its terms." *Id.* (citing *Tansey v. Robinson*, 24 Ill. App. 2d 227, 164 N.E.2d 272 (1960)). Neither side suggests, however, that SKF or RJW deviated seriously from the agreement's provisions in the actual conduct of their dealings. Therefore, the Court will treat the language of the agreement as an accurate model of the parties' actual conduct.

Under Illinois law, "[w]hether the relationship of principal and agent or owner and independent contractor exists is a question of fact for the jury unless the relationship is so clear as to be indisputable." *Perkinson*, 163 Ill. App. 3d at 266, 516 N.E.2d at 980 (citing *Yuhas v. Allis-Chalmers Distrib. Serv. Corp.*, 12 Ill. App. 3d 814, 821, 299 N.E.2d 166, 170 (1973)). Thus, the Court must determine whether facts that establish a principal-agent relationship or, on the other hand, an owner-independent contractor relationship, "clearly appear"—otherwise, "the question of the existence of the

12

relationship cannot be one of law." *Id.* at 821, 299 N.E.2d at 980 (citing *Tansey v. Robinson*, 24 Ill. App. 2d 227, 234, 164 N.E.2d 272, 275 (1960)).

SKF argues that it is clear, as a matter of law, that RJW was no more than an independent contractor. The Court agrees.

### A.    Right to control manner of performance

Did SKF have the right to control how RJW performed its responsibilities under the Transportation Agreement? SKF contends that this preeminent factor weighs against a finding of an agency relationship because SKF did not control RJW manager Richard Jarvis, had no control over RJW drivers' routes, did not monitor drivers' conduct (except at SKF's own facilities) or discipline drivers, did not train or instruct them, did not issue them any equipment, and had no power to fire them. SKF distinguishes this last point from its ability to refuse to load a shipment with a particular driver sent by RJW; these drivers, SKF contends, could always be reassigned to other work by RJW. SKF also contends that the agreement's provisions for periodic reports and meetings between it and RJW about cost control and efficiency "merely apprised SKF of the completion of RJW's work" and were not a means for SKF to dictate how RJW drivers should do their work. Def. Mem. at 18.

Boyle, on the other hand, argues key provisions of the agreement "gave SKF control over the manner in which RJW performed its transportation responsibilities for SKF." Pl. Mem. at 4. These provisions, Boyle says, required timely deliveries, periodic performance reports and meetings to discuss efficiency, "corrective action" by RJW when deliveries were late, adherence to the "metrics" spelled out in Appendix C of the

agreement, precise levels of insurance coverage, and compliance with safety, environmental, and employment laws of the jurisdictions where RJW transported shipments for SKF. Boyle further argues that the agreement's provisions for an on-site RJW manager at SKF's facility who reported to SKF management—an arrangement that Boyle contends helped "integrate RJW into SKF's operations," Pl. Mem. at 9—and for regular consultation about both firms' costs and how RJW could help SKF improve service of SKF's customers "reflect[] a degree of control over RJW that goes way beyond the typical independent contractor relationship between a shipper and carrier." *Id.* at 5.

The Court determines that there is no genuine issue of material fact as to whether the agreement gave SKF a degree of control over RJW's performance that made RJW more than an independent contractor in relation to SKF.[1]

Boyle's arguments aim largely at the agreement's provisions concerning activities that are ancillary to RJW's work transporting SKF's shipments—not that work itself. For example, Boyle says that the agreement's provisions on timeliness forced RJW to alter how it made deliveries if problems arose. This argument misses the point that no *particular* changes in method were dictated by this requirement. That is, SKF's desired result of timely delivery did not impose a choice of any one method for addressing lateness problems on RJW, just as the requirement of timely delivery did not necessarily impose any particular route or other methods for making the delivery.

---

[1] For reasons discussed above in relation to the proffered report of Boyle's expert, Michael Williams, the contention that SKF exercised a degree of control "way beyond" what is typical for an independent contractor relationship misses the point.

*See Wilson-McCray*, 2003 WL 22901569, at *5 (timeliness provision "merely specified the particular hauling task—i.e., delivery in a timely fashion—and did not control the manner in which this task is to be completed."); *Caballero*, 2007 WL 628755, at *3-4. Nor does the agreement contemplate that SKF, as opposed to RJW itself, would identify or prescribe the changes that would be made to correct a lateness problem.

Similarly, Boyle's argument that paragraph 6.1.3 of the agreement "gave SKF the right to get involved in the details of RJW's performance," Pl. Mem. at 5, misreads this provision, which contemplates quarterly discussions between the two firms aimed at improving service and communications and keeping costs low on both sides. The agreement does not present these discussions as an occasion for mandates by SKF regarding the particulars of delivery operations. Indeed, the only mandatory language in the paragraph relates to the holding of discussions on this set of topics. The mention of RJW's fuel costs and fuel economy is more pointed, but it corresponds to a provision requiring the parties to discuss "[h]ow modifications to [SKF's] activities could reduce [RJW's] costs." Def. Statement of Facts, Ex. H at ¶ 6.1.3.1. In sum, this provision of the agreement contemplates bilateral discussions about controlling costs, not marching orders from SKF to RJW.

The "metrics" spelled out in Appendix C of the agreement again address ancillary aspects of RJW's performance of transportation work—not the work itself. Among other things, the "start-up metrics" cover an RJW orientation program meant to familiarize its authorized drivers with SKF's needs, the equipment needed for RJW to comply with its obligations of prompt communication about transport problems, a "steering committee" for periodic discussion of performance issues, and operational

plans. None of these items involves SKF dictating the manner in which RJW or its drivers must perform their transportation role under the agreement. Further, the "metrics" leave up to RJW how it will marshal the personnel, tractors, and communications equipment required to perform under the agreement by the start date, for example. Thus, the "metrics" cover matters ancillary to RJW's performance of its transportation role, such as communication, and do not dictate precisely how RJW is to implement them.

The details of Jarvis's presence at SKF's Elgin facility give the Court some pause. The SKF-RJW agreement specifies the precise time by which Jarvis must report to work as well as various responsibilities, such as "interact[ing] between suppliers and customers making appointment pick ups and deliveries as required." Def. Statements of Facts, Ex. H at Appx. D. It also requires Jarvis to report to both firms' management, without hinting that the nature of this reporting will differ as to Jarvis's employer, RJW, versus the firm for which his employer is meant to be an independent contractor. Moreover, the record indicates Jarvis's office at the Elgin facility was provided rent-free by SKF and that one of the two computers Jarvis used in his work was provided by SKF and connected to SKF's information-technology system.

The circumstances of Jarvis's role under the contract, however, do not create a genuine issue of material fact as to an agency relationship between SKF and RJW. Jarvis's role was to facilitate communication between SKF and RJW's drivers and to coordinate the flow of shipments for RJW. Indeed, Jarvis's main role was to exercise RJW's direct control over its authorized drivers—i.e., its own agents. As SKF's logistics manager, Orly Cain, testified: "He [Jarvis] is there to have direct control over the drivers

when they report for duty." Def. Statement of Facts, Ex. G at 81. Correspondingly, SKF did not exercise such control.

Moreover, in the context of a dedicated-carriage contract, SKF could ask for some assurance as to the smooth coordination of the carrier's activity in the form of Jarvis's presence, without dictating how RJW or the individual drivers would perform their responsibilities. As Cain emphasized in his deposition, communication between the two firms was paramount. Having Jarvis on-site facilitated that communication. No reasonable jury could find that this gave SKF control over how RJW drivers drove their trucks.

The Court does not agree with Boyle that the agreement's provision requiring compliance with various laws and regulations shows SKF controlled RJW's operations. Language requiring compliance with laws and regulations does not render an independent contractor an agent or employee. *See Nat'l Continental Ins. Co. v. Empire Fire & Marine Ins. Co.*, 157 F.3d 610, 612-13 (8th Cir. 1998); *United States v. Mut. Trucking Co.*, 141 F.2d 655, 657 n.1 (6th Cir. 1944); *Narayan v. EGL, Inc.*, No. 05-C-4181, 2007 WL 2021809, at *9 (N.D. Cal. July 10, 2007) ("although the facts show that [defendant trucking company] exercised authority to ensure compliance with regulatory and safety requirements and general regulatory policies, they do not amount to control over the specific tasks to be carried out by plaintiffs for their assignments and are not otherwise inconsistent with the contractual provision that plaintiffs are independent contractors"); *Alaubali v. Rite Aid Corp.*, No 06-C-5787, 2007 WL 3035270, at *6 (N.D. Cal. Oct. 16, 2007). Similarly, contract provisions requiring that an independent

contractor carry liability insurance do not make an independent contractor an agent. *See Nat'l Continental Ins.*, 157 F.3d at 611-12.

Likewise, RJW's contention that "SKF's ability to veto any particular RJW driver" assigned to a shipment "is among the strongest factors demonstrating an agency relationship" flies in the face of rulings by this Court and others that a shipper's right to reject—but not fire—a driver does not create an agency relationship. *See Wilson-McCray*, 2003 WL 22901569 at *6 (citing *Shoemaker*, 273 Ill. App. 3d at 918, 652 N.E.2d at 1039).

Finally with regard to this factor of the agency-versus-independent-contractor analysis, Boyle's attempt to distinguish *Shoemaker* and *Perkinson* on the basis that "each outlin[es] a relationship between a motor carrier and shipper characterized by the shipper exercising less control than in the instant dispute," Pl. Mem. at 8, is unpersuasive because it fails to analyze any of the key facts in those cases in relation to those present here.

Boyle makes a more serious effort to distinguish this Court's decision in *Wilson-McCray*. Still, the distinction Boyle tries to draw depends on his assertion that the SKF-RJW agreement "gave SKF the wholesale right to be directly involved in RJW's operations and control over the manner in which RJW transported SKF loads," Pl. Mem. at 14—and on his assumption that, because "[t]here is nothing in the record [in *Wilson-McCray*] about any of the rights conferred to the shipper and on the carrier," Pl. Mem. at 14, the latter agreement must have been less rigidly prescriptive.

18

There are three problems with this. First, Boyle's argument assumes what it sets out to prove, namely, that the SKF-RJW agreement controlled the manner of RJW's performance. Second, as SKF points out in its reply, the Court's decision in *Wilson-McCray* does describe at least three provisions of that contract: the shipper required the carrier to make certain shipments within 24 hours and to report accidents to the carrier, and the shipper had the right to refuse to load a driver's truck for various reasons. *Wilson-McCray*, 2003 WL 2201569, at *6. Third, even if the agreement in *Wilson-McCray* was less extensively prescriptive than this one, this does not mean that the Court must reach a different result here than it did in *Wilson-McCray*.

In sum, no reasonable jury could find that the primary factor under Illinois law for determining whether a principal-agent relationship exists—the right of the person or entity for whom the work is done to control the manner, and not just the result, of the work—favors Boyle's position. That is, no reasonable jury could find SKF exerted control over how RJW performed its transportation activities under the firms' agreement. This determination in turn grounds a conclusion that, as a matter of law, no principal-agent relationship existed between SKF and RJW. Nonetheless, the Court will examine a handful of additional arguments raised by Boyle that relate to other factors for principal-agent relationships under Illinois law.

### B.     Relation of RJW's activities to SKF's overall business

An additional factor, common in the employee-versus-independent-contractor analysis conducted in workers compensation cases, is "the significance of the nature of the work performed by the alleged employee in relation to the general business of the

employer." *Ware v. Indus. Comm'n*, 318 Ill. App. 3d 1117, 1122, 743 N.E.2d 579, 583

(2000) (citing *Ragler Motor Sales v. Indus. Comm'n*, 93 Ill. 2d 66, 71, 442 N.E.2d 903,

905 (1982)).  The logic of this factor in worker's compensation cases is as follows:

> [B]ecause the theory of workmen's compensation legislation is that the cost of
> industrial accidents should be borne by the consumer as a part of the cost of the
> product, . . . a worker whose services form a regular part of the cost of the
> product, and whose work does not constitute a separate business which allows a
> distinct channel through which the cost of an accident may flow, is presumptively
> within the area of intended protection of the compensation act.

*Id.* at 1124, 743 N.E.2d at 585 (quoting *Ragler*, 93 Ill. 2d at 71, 442 N.E.2d at 905).

Thus, cases finding that this factor supports the existence of an employer-employee

relationship, rather than an independent contractor arrangement, have found that the

worker's activities are integral to the putative employer's business as a whole—for

example, operating an ice cream cart in a case where the putative employer was an ice

cream distributor for which the carts were the only means of distribution.  *Id.* at 1125,

743 N.E.2d at 585 (citing *Luby v. Indus. Comm'n*, 82 Ill.2d 353, 360, 412 N.E.2d 439,

442 (1980)).

Boyle attempts to apply this factor here, arguing that RJW was SKF's agent

because their agreement made RJW "an integral part" of SKF's operations. Pl. Mem. at

10.  Specifically, Boyle points to the agreement's placing Jarvis at SKF's facility and

generally delegating to RJW a function SKF had previously handled itself when it

operated its own truck fleet.

This inquiry is ill-suited to the trucking context.  The trucking cases the Court has

researched do not apply this factor in determining whether an agency relationship

exists, likely because it does not translate well from worker's compensation law.  To use

the language of *Ragler*, trucking is a readily identifiable separate business and thus a "distinct channel through which the cost of an accident may flow." *Ragler*, 93 Ill.2d at 71, 442 N.E.2d at 905. In sum, this argument does not give rise to a genuine issue of material fact as to the existence of an agency relationship between SKF and RJW.

## C. Equipment

Boyle also argues that support for an agency relationship exists because SKF provided certain equipment to RJW. The Court has already addressed the equipment and workspace provided to Jarvis at SKF's Elgin facility. Boyle's remaining arguments on this point do not create a genuine issue of material fact as to whether an agency relationship existed. The fact that SKF provided the trailers that RJW drivers attached to their tractors does not mean SKF provided equipment to these drivers. The record indicates that, as SKF succinctly puts it, "the trailer is the load." Def. Reply at 6. Thus, saying that SKF supplied equipment in the form of trailers is akin to saying that a customer supplies the postal service with equipment in the form of the envelope in which she mails her letter. The record further indicates that RJW, not SKF, was responsible for supplying its drivers with the communications equipment called for in the agreement.

Thus, the provision-of-equipment factor for determining whether an agency relationship exists does not point to a genuine issue of material fact.

## D. Agency-relationship factors in the aggregate

No genuine issue of material fact exists with respect to any of the individual agency-relationship factors discussed above. Additionally, the Court determines that no reasonable jury could find, considering these factors in the aggregate, that RJW was SKF's agent.

## Conclusion

For the reasons stated above, the Court grants defendant SKF USA, Inc.'s motion to exclude plaintiffs' proffered expert opinion against SKF [docket no. 84] and its motion for summary judgment [docket no. 78]. Because this disposes of Boyle's asserted claims against SKF, SKF is terminated as a defendant. The case remains set for a status hearing on July 10, 2008 at 9:30 a.m. to address the possibility of settlement and to set a briefing schedule on the other pending motions.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 20, 2008